**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| RALPH A. SHOBERG, JOHN B. JOHNSON, JAMES R. STEPHENS B. AMILEE WENDT, ANN B. VANDERHOEF, RICHARD COOK and LOUIS SMITH, individually and derivatively on behalf of CLEARMEDIAONE, INC., and SECURITYCOMM GROUP, INC., and their shareholders as a class, *Plaintiffs* | } } } } } } } } } } } } } |
| v. | } } |
| CLEARMEDIAONE, INC. ROBERT F. STRANGE JR., ROBERT J. VIGUET JR., and THOMPSON & KNIGHT, LLP, *Defendants* | } } } } } |

CIVIL ACTION NO. H-05-2122

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case presents an amalgamation of claims brought by the shareholders and creditors of Defendant Clearmediaone ("CMO"), a Delaware corporation.  Pending before the court is Defendant Robert J. Viguet Jr. ("Viguet") and Defendant Thompson & Knight, LLP's motion to dismiss (Instrument No. 31).  For the following reasons, the court ORDERS that Defendants' motion is GRANTED-in-part and DENIED-in-part.

I.   <u>Relevant Factual Allegations</u>

The gravamen of Plaintiffs' Consolidated Complaint ("PCC") is that Defendant Robert F. Strange ("Strange") masterminded a complex and illegal scheme to make himself and his partners rich.  The scheme entailed incorporating a business, selling its shares at artificially inflated prices to gullible early investors, using that money to purchase other businesses, and, finally, merging

1

the resulting business into a public shell.  The self-described incubator for Strange's projects was a limited partnership named eComm Ventures.  The partners in eComm Ventures are Strange, Viguet, Chuck Gardner ("Gardner"), and Wesley Jaynes ("Jaynes").

CMO was founded in 2000.  Viguet, an attorney, helped form CMO and owns a portion of the company through his participation in eComm Ventures.  eComm Ventures owns approximately one third of CMO.

Strange formed CMO's first operating division, Media Home Systems, to compete in the audio video home installation business.  Media Home Systems was staffed with key employees hired away from a business rival, AES.  AES quickly sued its former employees and CMO for theft of proprietary business information.  During this period, CMO was unable to fund payroll taxes or even pay its employees.  Nonetheless, shares were offered to the public at fifty times par value, $0.50 per share.

According to the Plaintiffs, Strange and Viguet coauthored the memoranda used to sell CMO's securities in 2000 and 2001.  These memoranda represent CMO as a thriving, ongoing, and well respected business with a "strong reputation for quality products and services."  Possible investors were also provided a *proforma* income statement showing historical earnings of $901,000 and projected revenues in the tens of millions of dollars.  On the basis of the information in the August 2000 memorandum Plaintiff Louis Smith invested $100,000.  Based on the representations in the March 2001 memorandum Plaintiffs Richard Cook and Ann Vanderhoef each invested $40,000.

During the following two years CMO rapidly expanded its operations by acquiring other businesses.  Some of the businesses where successful and some were not.  According to Plaintiffs,

when money flowed into CMO Strange converted it to his personal use.  With the exception of one shareholder letter issued in 2001, no information was given to the CMO investors.

By spring 2003 CMO was insolvent and owed substantial sums.   To escape CMO's debts the eComm Venture partners decided to create a new corporation named SecurityComm Group ("SecurityComm").  According to Plaintiffs, Defendants' plan was for SecurityComm to take over CMO's business, leaving an empty shell for CMO's creditors and some of its shareholders.  During a teleconference to discuss the plan, Viguet reassured Gardner and Jaynes that their would be "no successor issues."  He also told them that Louis Smith could be approached for funds because he was not a CMO creditor.

Strange approached Smith in May 2003.  He told him that a new Nevada corporation named SecurityComm Group had been formed to serve as a name change for CMO and that CMO's stock would undergo a four-to-one reverse split.  As part of the pitch, Strange gave Smith a CMO prospectus showing substantial earnings and a healthy bottom line.   In June 2003, relying on these misrepresentations, Smith invested in CMO/SecurityComm.  Plaintiffs' allege that some of the documents prepared by Strange were based on materials originally provided by Viguet.  Eventually Smith and his wife presented Strange with a $65,000 check.

In July 2003, SecurityComm was formed as a Texas corporation.  While some of the investors in CMO were carried over – eComm Ventures was given more than a third of SecurityComm's shares – others were excluded from the new company.  None of the Plaintiffs were told about the new company or its purpose.  As planned, SecurityComm took over CMO's business, leaving an empty shell for its creditors

After Viguet joined Thompson & Knight LLP ("TK") in September 2003, TK assumed

the representation of Strange, CMO, and SecurityComm. It represented CMO in this litigation.  It

also drafted a private placement memorandum ("PPM") used in connection with SecurityComm's

bid to purchase a corporation named Westex.  The memorandum describes SecurityComm as a

startup and makes no reference to its relationship to CMO.  Importantly, rather than disclose

SecurityComm's actual financial data, the memorandum substitutes the financial data of a

corporation named APT, which SecurityComm had unsuccessfully attempted to purchase.

SecurityComm completed its acquisition of Westex in December 2003.  In February,

however, the Westex principals and stakeholders filed suit against SecurityComm.  In April 2004

they repossessed their assets.  SecurityComm, represented by TK, responded by suing for fraud

and conversion. According to Plaintiffs, TK presented perjured testimony to the effect that

SecurityComm had finalized the purchase APT.  In May 2004, a settlement was reached.

SecurityComm released all its claims in exchange for the payment of its legal fees and a

consulting agreement for Strange.  The total value of the settlement was $180,000.

II.    Law

    A.  Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted."

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982).  A

court dismisses a complaint under Rule 12(b)(6) only  when "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46(1957).  "The question therefore is whether in the light most

favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any

valid claim for relief."  5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 1357 (2nd ed. 1990).  A plaintiff must, however, assert more than general legal conclusions to avoid dismissal.  *Jefferson v. Lead Industries Assoc., Inc.,* 106 F.3d 1245, 1250 (5th Cir. 1997). "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery. . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial."  *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting 3 WRIGHT & MILLER FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1216 at 156-159).  Where a complaint asserts merely conclusory allegations, these conclusory allegations and unwarranted deductions of fact are not admitted as true. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir.1992). Second, where a complaint shows on its face that it is barred by an affirmative defense, a court may dismiss the action for failing to state a claim. *Kaiser Aluminum*, 677 F.2d at 1050.

In considering a Rule 12(b)(6) motion to dismiss a district court may review the pleadings on file, *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000), and matters of public record. *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).  "Pleadings on file" includes "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [its] claim." *Collins*, 224 F.3d at 498-99.

III.    Application of Law to the Facts.

Viguet and TK ("the attorney defendants") argue that Plaintiffs' claims against them fail for four reasons: first, because Plaintiffs' investments occurred before TK could have joined the scheme; second, because Plaintiffs' complaint fails to plead fraud with sufficient particularity; third, because certain of Plaintiffs' claims are barred by statute of limitations; and fourth, because Plaintiffs derivative, class, and conspiracy claims are defective.  The court will address Plaintiffs'

5

fraud claims first.

Plaintiffs' complaint charges Viguet with violating State and Federal securities laws with respect to the August 2000 and March 2001 memoranda. Specifically, Plaintiffs charge Viguet with violating Securities and Exchange Commission Rule 10b-5(b), Texas Business & Commercial Code § 27.01, and Texas Revised Statutes Annotated Article 581-33. Viguet argues that Plaintiffs have failed to plead these claims with sufficient particularity.

In the Fifth Circuit, both Federal and State securities fraud claims are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b). *Williams v. WMX Technologies, Inc.*, 112 F3d 175, 177 (5th Cir.1997). Additionally, Plaintiffs' Federal claims are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Viguet argues that Plaintiffs' complaint fails to meet these requirements. Specifically, Viguet claims Plaintiffs have not (1) specified those statements made by him that are alleged to be false; (2) stated facts giving rise to a strong inference of scienter; and (3) properly pled causation. Because the court agrees that Plaintiffs' complaint fails to sufficiently link Viguet to the statements at issue, it will not address Viguet's other arguments.

"Plaintiffs admit that they cannot point with exactitude as to what Viguet authored." Resp. at 21 (Instrument No. 32). Instead, they rely on conclusory allegations that he co-authored the 2000 and 2001 memoranda with Strange. *See* Plaintiffs' Consolidated Complaint ("PCC") at ¶¶ 47, 62-63. Under Circuit precedent, specific factual allegations must link the individual to the production of the statement at issue. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc*., 365 F.3d 353, 365 (5th Cir. 2004). Plaintiffs have not met this standard. They have attempted to tie Viguet to the statements by first citing irrelevant time records and then arguing that similarities between

6

the 2003 PPM and 2000 and 2001 memoranda indicate they were written by the same person.

Neither of these arguments is convincing.  Viguet's contemporaneous time records have detailed

notations reflecting what Viguet was doing during the hours in question; they do not reflect his

having worked on offering memoranda.  *See* Time Records (Doc. 19,  Ex. 3).  Similarly,

Plaintiffs' subsidiary argument, that similarities between the 2003 PPM and the earlier

memoranda tie them to the same author, fails because the similar sections do not contain the

relevant misrepresentations.  Moreover, even if they did, this similarity could easily result from

TK and Viguet having relied on Strange's description of CMO in the earlier memoranda.

Viguet and TK are charged with violating Rules 10b-5(a) and (c) in connection with the

sale of securities to Louis Smith.  Because Plaintiffs' theory as to each defendant is unclear from

the face of the complaint, Plaintiffs' claims fail to satisfy the pleading requirements of Federal

Rule of Civil Procedure 9(b) and the PSLRA.[1]  Furthermore, judging from Plaintiffs' response to

the instant motion, Plaintiffs' theory as to TK relies on the flawed idea that TK can be liable for

conduct that occurred before it joined the alleged conspiracy.  Rules 10b-5(a) and (c) do not cast

so wide a net.  The requirement that the fraud occur in connection with the sale of securities is

fundamental.  *See Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164 (1994) (holding

that the conduct prohibited by Rule 10b-5 is circumscribed by the language of 15 U.S.C. § 78j .).

In this case, Plaintiffs concede that Viguet joined TK four months after the sale of securities to

---

[1]The elements of a claim under subsections (a) and (c) must be pled with particularity:
they are (1) that the defendant committed a deceptive or manipulative act with *scienter* (2) that
the act affected the market for securities or was otherwise in connection with their purchase or
sale, and (3) that defendant's actions caused plaintiff's injuries. *Newby v. Enron Corporation*,
01-cv-3624, 2006 U.S. Dist. LEXIS 50129, *67 (S.D. Tex. July 20, 2006) (*citing in re Parmalat
Sec. Litig.*, 376 F.Supp. 2d. 472, 491-492 (S.D.N.Y. 2005).

Louis Smith.  TK's acts could not, therefore, have been committed in connection with the sale of securities to Plaintiffs.  As to Viguet, Plaintiffs' claim that Strange used documents based in part on materials originally supplied by Viguet fails to specify how these original materials were deceptive.

Defendants argue that Plaintiffs' derivative claims should be dismissed because Plaintiffs did not verify their complaint and cannot adequately and fairly represent the interests of CMO and SecurityComm.  Since Defendants' filed their motion, Plaintiffs have verified their complaint.  *See* Verification (Instrument No. 34).  Defendants' first argument is therefore moot.  As to the second issue, Defendants argue that Plaintiffs are incapable of fairly representing the interests of CMO and SecurityComm for three reasons;[2] first, because it is unclear from the complaint which Plaintiffs own shares in which company and how they came to own those shares; second, because Plaintiffs' personal claims conflict with the claims they seek to assert on the companies' behalf; and third, because the companies themselves are in conflict with each other.  On the record before the court none of these arguments is persuasive.  It is not disputed that all the Plaintiffs are shareholders in CMO.  As for SecurityComm, Plaintiffs have alleged that SecurityComm was formed as a continuation of CMO, that they were not informed of the SecurityComm's incorporation, and that some of them were carried over to SecurityComm in various hypothetical

---

[2] The following factors are relevant to determining a derivative plaintiff's ability to provide fair and adequate representation: (1) economic antagonism between the plaintiff and class; (2) the remedy sought by plaintiff in the derivative action; (3) signs that the named plaintiff is not the driving force behind the litigation; (4) plaintiff's familiarity with the litigation; (5) other litigation pending between the plaintiff and defendants; (6) the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; (7) plaintiff's vindictiveness toward the defendants; and, finally, (8) the degree of support plaintiff was receiving from the shareholders he purported to represent." *Davis v. Comed, Inc.*, 619 F.2d 588, 593-94 (6th Cir. 1980).

scenarios.  Any failure by the Plaintiffs to establish precisely when they became SecurityComm shareholders is therefore due to Defendants' actions.  Moreover, the attorney defendants have not presented any evidence establishing that Plaintiffs were not shareholders of SecurityComm.  As to Defendants' second argument, the Fifth Circuit has observed that "a plaintiff is not necessarily disabled to bring suit simply because some of his interests extend beyond that of the class."  *Blum v. Morgan Guaranty Trust Co.*, 539 F.2d 1388, 1390 (5th Cir.-OLD 1976).  In this case, some of the individual Plaintiffs' claims extend beyond the class.  These include actions on promissory notes, securing execution of documents by deception, and breach of employment agreements. The central concern when a plaintiff has claims extending beyond the class is that he will use the derivative claim to gain leverage for his individual claims. In *Blum,* for example, plaintiff shareholder sued defendant bank after having been informed by the bank that he was in default on a $2,000,000 loan.  The District Court dismissed plaintiff's case finding, *inter alia*, that plaintiff's ability to fairly and adequately represent the interests of the other shareholders was compromised. Affirming, the Court of Appeals noted that, "Blum's personal litigation involving his debt also flaws his ability to 'fairly and adequately represent the interests of the shareholders.'"  *Id.*  The situation here is dissimilar.  Neither CMO nor SecurityComm has asserted any claim against Plaintiffs in this or any other litigation.  Moreover, all the plaintiffs, shareholders and creditors alike, have an interest in maximizing the companies' assets.  The court therefore concludes that Plaintiffs' personal claims do not prejudice their ability to represent the companies derivatively. Defendants' third argument is that CMO and SecurityComm's interests conflict.  The court disagrees.  Plaintiffs have alleged that SecurityComm was a mere continuation of CMO, designed to escape its debts and checkered past.  Defendants have not introduced any evidence to the

contrary.  Should discovery bring to light new evidence substantiating Defendants' claims, they may renew their motion.

Defendants' claim that Plaintiffs' derivative claims for legal malpractice are barred by limitations is unconvincing.  The limitations period for legal malpractice is two years, subject to the discovery rule.  Plaintiffs claims against TK arise from TK's actions in late 2003 and were filed in May 2005. They are therefore timely.

Defendants' last argument concerns Plaintiffs' conspiracy to breach fiduciary duty claim. TK and Viguet argue that Plaintiffs' conspiracy claim should be dismissed because Plaintiffs' have failed to plead the claim with sufficient particularity.[3]  After reviewing the complaint, the court agrees that Plaintiffs' claims against TK should be dismissed.  Plaintiffs have, however, successfully stated a claim against Viguet.  The PPC details the meeting at which Strange, Viguet, Gardner and Jaynes agreed to form SecurityComm to escape CMO's liabilities and alleges that the scheme was carried out to Plaintiffs' detriment.  The law requires no more.

IV.    <u>Conclusion</u>

For the aforementioned reasons, the court ORDERS that Defendants' motion to dismiss is GRANTED-in-part and DENIED-in-part.

Defendant Thompson & Knight LLP's ("TK") motion to dismiss Plaintiffs' Federal, State and common law fraud claims is GRANTED.  TK's motion to dismiss Plaintiffs' conspiracy

---

[3] The essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

claims is also GRANTED.  TK's motion to dismiss Plaintiffs' derivative claims is DENIED.

Defendant Robert J. Viguet Jr.'s motion to dismiss Plaintiffs' Federal, State and common law fraud claims is GRANTED.  His motion to dismiss Plaintiffs' derivative and conspiracy claims is DENIED.

Signed at Houston, Texas, this 20th day of September, 2006.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE